**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

**Plaintiff,**

v.

PEDRO LUIS DE JESUS-ORTIZ,

**Defendant.**

CRIMINAL NO. 24-046 (RAM)

<u>**OPINION AND ORDER**</u>

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court is the Defendant Pedro Luis De Jesus-Ortiz' ("Defendant" or "Mr. De Jesus") *Motion to Suppress Evidence* ("*Motion*"), the United States of America's (the "Government") *Response in Opposition*, and the post-hearing briefs submitted by the parties. (Docket Nos. 20, 28, 61, and 62, respectively). For the following reasons, the *Motion* is **GRANTED IN PART** as to the statements made to federal agents and **DENIED IN PART** as to all remaining issues.

**I.    PROCEDURAL BACKGROUND**

Mr. De Jesus was charged by complaint on February 2, 2024, after Puerto Rico Police Bureau ("PRPB") agents encountered him the previous day. (Docket Nos. 1 and 1-1). On February 15, 2024, a grand jury in this district returned a one-count indictment charging him with being a felon in possession of a firearm and

ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (Docket No. 9).

On April 29, 2024, Defendant filed the instant *Motion*, in which he moved to suppress all physical evidence and statements from his stop, seizure, search, and arrest by the PRPB three months earlier. (Docket No. 20). Specifically, Mr. De Jesus contends that: (a) the stop and search of his person and vehicle were conducted without reasonable suspicion; (b) the PRPB lacked probable cause to arrest him; and (c) he properly invoked his right to counsel and to remain silent. Id. He also requested an evidentiary hearing. Id. at 17.

In its *Response in Opposition*, the Government averred that Defendant had not met his burden to establish standing, and thus could not challenge a search of his girlfriend's purse. (Docket No. 28 at 2-4). Moreover, the Government asserted that Mr. De Jesus had not properly invoked his Miranda rights. Id. at 4-7. However, it did not oppose the setting of an evidentiary hearing. Id. at 8.

The Government did, however, move for a bifurcated hearing and requested the Court first set a hearing limited to the threshold issue of standing before receiving evidence regarding the suppression motion on another date. (Docket No. 29). The Court denied the motion for bifurcation but ordered that the parties first address the issue of standing. (Docket No. 30).

Before the evidentiary hearing, the Government also filed an informative motion indicating that it would not seek to introduce Defendant's statements to Homeland Security Investigations ("HSI") in its case-in-chief. (Docket No. 37). Thus, it claimed that the statements were no longer germane to the suppression hearing. Id. Mr. De Jesus disagreed, requesting that the Court suppress the statements nevertheless and bar their use for impeachment or other collateral purposes. (Docket No. 38). The Government averred in response that the matter was moot, and that Defendant had failed to explain why his statements were unreliable. (Docket No. 43).

The Court held an evidentiary hearing on June 20, 2024, and July 3, 2024, during which it received testimony and exhibits from the parties. (Docket Nos. 39 and 48). During the second hearing date, the Court ordered that, based on the Government's representations, it would suppress statements that Mr. De Jesus made to HSI agents, but would leave the door open to their use for impeachment depending on the reliability of the statements. (Docket No. 58 at 3). Following the publishing of transcripts, the parties filed post-hearing memoranda. (Docket Nos. 61 and 62).

## II. FACTUAL BACKGROUND

The following account of the facts is drawn from the testimonial and documentary evidence received at the evidentiary

Criminal No. 24-046 (RAM)                                          4

hearing.[1] The Defendant first testified as to standing. The Government then called PRPB Officer Cristian Hiraldo-Rivera ("Officer Hiraldo"), Officer Samuel Santiago ("Officer Santiago"), and Emmanuel Lopez-Matos ("Lopez") as witnesses. Defendant called PRPB Officer Paola Farias-Santiago ("Officer Farias") as a witness, and he also testified on his own behalf.

**A. Standing**

Mr. De Jesus testified that on the morning of February 1, 2024, he left the Marriott casino toward Blanca Street in his 2015 Nissan Sentra. (Docket No. 55 at 12). The Nissan Sentra was registered to Defendant on that date. Id. at 14. On cross-examination, Mr. De Jesus explained that he had arrived at the casino at approximately 2:00 am with his girlfriend,[2] and that they had stayed until approximately 7:00 or 7:30 am. Id. at 18. He was on supervised release, and he testified that his probation officer was aware that he was at the casino. Id. at 21. Defendant's girlfriend was with him throughout the whole time he was at the casino, and she had her purse with her. Id. at 21-22. Once they

---

[1] Exhibits presented at the suppression hearing were filed at Docket Nos. 49-1 and 50-1. Later references to these exhibits shall be cited as follows: (Exhibit __).

[2] Mr. De Jesus also described the woman as his wife or consensual partner in later testimony. (Docket No. 58 at 70).

left, the purse was kept on floor of the passenger side of the Nissan Sentra. Id. at 24.

**B. Surveillance**

On February 1, 2024, Officer Hiraldo was surveilling a location known for drug sales at the intersection of Roosevelt Street and Blanca Street, within the Figueroa ward in the Santurce neighborhood. Id. at 29. He was familiar with the location and modus operandi of the drug point, having been there approximately seventy times before. Id. at 29-30. A buyer typically drives by with the windows of his vehicle lowered, flashes the car's headlights on and off, and then approaches several construction drums near the road. Id. at 30. Another person moves the drums, the driver proceeds along Roosevelt Street, and a drug transaction is conducted through the driver's side window. Id.

Officer Hiraldo arrived in the Figueroa ward at approximately 6:00 am in the backseat of an unmarked vehicle with a pair of binoculars. Id. at 31. Another officer was driving the unmarked police car, which had tinted windows. Id. at 31, 64. The officers were stationed 300 feet or more from the drug point, and Officer Hiraldo had full visibility given that it was a sunny day and he had handheld binoculars. Id. at 33, 70. He saw a gray Nissan Sentra about to turn left onto Roosevelt Street from Orta Street with its two front windows lowered. Id. at 35. Defendant testified that the

rear windows of his vehicle are tinted such that twenty percent of the light can enter the back of the car. (Docket No. 58 at 64). He stated that when he arrived near Blanca Street and Roosevelt Street, his car windows were up. Id.

Through the window and using his binoculars, Officer Hiraldo observed the driver, who he identified during the hearing as the Defendant, along with a female passenger. (Docket No. 55 at 35, 37-38). The Nissan Sentra approached the construction drums, which were removed by another person, and passed through Roosevelt Street. Id. at 38. Officer Hiraldo noted that he did not see the headlights flash given his angle and the sunny day. Id. at 75-76. Once the car entered the street, a third man approached the driver's side window with clear baggies containing what appeared to be cocaine. Id. at 39. The driver exchanged cash for several baggies, whereupon Officer Hiraldo provided information about the drug transaction and the Nissan Sentra over the radio. Id. at 39-40; Exhibit 2A at 1. However, Defendant testified that he conducted the cocaine purchase inside his car, hand to hand. (Docket No. 58 at 67). Additionally, Mr. De Jesus stated he did so on the corner of Blanca Street and Nueva Palma Street, which is an area that would be outside Officer Hiraldo's line of sight. Id. at 67-68; (Docket No. 55 at 65). Officer Hiraldo also testified that he did not see a firearm during his surveillance. (Docket No. 55 at 84).

### C. Vehicle Stop and Arrest

Officer Santiago was tasked with performing interventions on February 1, 2024, and he heard Officer Hiraldo's radioed report regarding the drug transaction involving the driver of the gray Nissan Sentra. Id. at 91-94. Both officers testified that when law enforcement agents stage an intervention or arrest of individuals suspected of purchasing drugs, they attempt to move the purchaser's vehicle away from the drug point as fast as possible so that the interdiction is not noticed by the drug sellers. Id. at 45, 94-95, 97. The sellers or lookouts sometimes attempt to take buyers away from the police during an intervention. Id. at 97, 107.

After Officer Santiago heard the radio communications, he moved his vehicle to a gas station until he observed the Nissan Sentra a few minutes later. Id. at 97. The officer then followed the vehicle, turned on his lights and sirens, and stopped the vehicle. Id. at 97-98. The windows of the Nissan Sentra were halfway open. Id. at 98. Uniformed officers on motorcycles were the first officers to detain the Defendant, and according to Mr. De Jesus, he was stopped by six officers. Id. at 124; (Docket No. 58 at 69). When Officer Santiago approached the driver's side, he saw Mr. De Jesus, informed him that he was under arrest, and instructed him of his Miranda rights. (Docket No. 55 at 98-100). Officer Santiago testified that Defendant was not free to leave at

this time, and that the <u>Miranda</u> instruction took less than 46 seconds based on a surveillance video recording of the interaction. <u>Id.</u> at 129, 135; *see also* Exhibit E. Officer Farias heard Officer Santiago verbalize the warnings. (Docket No. 58 at 51).

Officer Santiago testified that Mr. De Jesus stepped out of the car and held two small, clear, pressure-sealed envelopes with white powder inside. (Docket No. 55 at 101). He voluntarily handed over the packets, and after hearing the <u>Miranda</u> instruction, stated that the drugs were for his own use without being prompted by a question. <u>Id.</u> at 101-02. The handover was corroborated by Officer Farias. (Docket No. 58 at 51). However, Defendant stated that his hands were empty and that he had left the cocaine inside the vehicle when he was arrested. <u>Id.</u> at 68-69. He points to the affidavit supporting the *Complaint* to support this statement, which notes that two small Ziploc bags containing a white powdery substance were discovered pursuant to a search of the Nissan Sentra.[3] (Docket No. 1-1 at 3).

### D. Observation of Firearm

At the same time, Officer Farias was arresting the female passenger of the Nissan Sentra. (Docket No. 55 at 103). Like

---

[3] Although Defendant had subpoenaed the affiant, Task Force Officer Juan C. Clemente Hernández, he did not call the affiant as a witness. (Docket No. 58 at 61).

Officer Santiago, she was present to assist with interventions and
provide backup to Officer Hiraldo. (Docket No. 58 at 24-25). She
testified that she saw a firearm in plain view, inside a purse on
the floor of the passenger side of the vehicle. Id. at 34-35.
Specifically, the purse was open and leaning vertically against
the console of the vehicle. Id. at 43, 47. Defendant agreed that
the purse was located in that location. Id. at 79. The purse was
open and Officer Farias saw both the extended magazine and the
butt of the gun. Id. at 43, 53. The gun itself would have weighed
approximately five to eight pounds. Id. at 59. Although there were
other items in the purse such as a cell phone and cash that Officer
Farias could not testify to, the firearm and extended magazine fit
completely within the zippered purse without those items. See id.
at 45, 57-59. However, Mr. De Jesus said there were neither cell
phones nor money in the purse. Id. at 80. In total, Officer Farias
interacted with the female passenger for approximately a minute
and a half. Id. at 43.

Officer Farias yelled that there was a weapon, upon which
Officer Santiago approached the left side of the car and saw there
was a weapon coming out of a black bag on the floor of the passenger
side. (Docket No. 55 at 104; Docket No. 58 at 53). When the weapon
had been reported, Mr. De Jesus said "that's mine," without having
been asked a question. (Docket No. 55 at 105). Officer Santiago

saw the handle, grip, and magazine of the weapon sticking out of
the bag. Id. at 104-05. The officer later noted the bag was brown
and pink. Id. at 105.

After seeing the firearm, Officer Santiago closed the door of
the Nissan Sentra to move it out of the area, and Defendant was
moved away by other officers. Id. The officers at the scene neither
took photos of the weapon nor secured it. Id. at 137; Docket No.
58 at 33-34. Officer Santiago also did not radio his fellow
officers that he had recovered the cocaine and the firearm. (Docket
No. 55 at 139). The car was moved near the gas station where there
was the maritime division of the San Juan Municipal Police, then
put on a police tow truck to be taken to the drug and narcotics
division in Guaynabo. Id. at 107-08.

**E. Interview**

At the drugs and narcotics division, Officer Santiago
provided Mr. De Jesus with a paper form containing a Miranda rights
instruction. Id. at 109. The form was signed by Officer Santiago
and the Defendant, who indicated that he understood his rights and
did not want to answer any questions. Id. at 111-12. Afterward,
Officer Santiago read Mr. De Jesus his rights; conducted a field
test, which was positive for cocaine; and filled out a seized
vehicles form. Id. at 113. Officer Santiago did not ask any
questions, but while Defendant was filling out the seized vehicles

form, Mr. De Jesus stated that the feds would soon come to pick him up. Id. at 113. Officer Santiago was surprised and asked him why, to which Defendant replied he was on federal probation. Id. at 114.

Defendant noted he had invoked his rights at approximately 10:45 am on the morning of February 1, 2024. (Docket No. 58 at 70-71). He had no other exchanges until around 3:00pm in the afternoon, when Officer Santiago purportedly told Mr. De Jesus to claim ownership of the firearm so that his consensual partner would not have to face criminal charges. Id. at 71. Defendant stated he had no knowledge of the gun before 3:00pm, but shortly after testified that he knew the weapon was in a purse inside his car "all the time." Id. at 74-75. After the exchange with Officer Santiago, Defendant was then interviewed by federal agents. Id. at 73.

**F. Statements While Incarcerated**

The Government also called Emmanuel Lopez-Matos, who works as an investigations officer at the federal jail, Metropolitan Detention Center ("MDC") Guaynabo. (Docket No. 58 at 5). Mr. Lopez explained how MDC Guaynabo's inmate call system functions. Id. at 6. Each inmate is assigned a unique number that he is required to enter before dialing a phone number. Id. Inmates are also told not to share their identification number. Id.

Mr. Lopez listened to a recording of a call made by Defendant. Id. at 7. He associated the call with Mr. De Jesus because the latter had to state his name and identification number on the call. Id. at 8, 11. The identification number was read into the record, and the Court took judicial notice that it matched Defendant's Bureau of Prisons register number. Id. at 12, 15-16. Moreover, Mr. De Jesus acknowledged he had listened to the call and that he was the person who placed it. Id. at 82.

On the call, the Defendant instructs his cousin not to sell a Sentra. Id. at 83; (Docket No. 56-1 at 2). Mr. De Jesus also discusses "[s]ome money they took from me the day they got me" and other money found in his "missus's purse" that he cannot claim. (Docket No. 56-1 at 8). Specifically, he explains there was "a little over two thousand bucks and so" in the purse, along with a cell phone, that he cannot claim "because those are her things." Id. at 9. Defendant first testified that there was one hundred dollars in his wife's purse and later acknowledged that he had told his cousin the purse contained two thousand dollars. (Docket No. 58 at 84, 90-91, 99).

### III. ANALYSIS

#### A. Officer Hiraldo's rough notes are not Jencks Act statements

During the hearing, Defendant moved for the Government's production of rough notes taken by other officers and dictated by

Officer Hiraldo as he conducted surveillance pursuant to 18 U.S.C.
§ 3500 (the "Jencks Act"). (Docket No. 55 at 53-62). In the
alternative, Mr. De Jesus moved to strike Officer Hiraldo's
testimony pursuant to Fed. R. Crim. P. 26.2(e). Id. at 62.
Defendant also informed the Court that he intended to brief an
issue concerning the Jencks Act statements in his post-hearing
memorandum. (Docket No. 58 at 100). However, the memorandum did
not include any discussion of the issue. See (Docket No. 61). The
Court therefore considers the argument waived.

Even if the objection were not waived, the relief sought by
Mr. De Jesus is unwarranted. A statement under the Jencks Act
includes, as relevant here, "a written statement made by [the]
witness and signed or otherwise adopted or approved by him" or "a
stenographic . . . recording . . . which is a substantially
verbatim recital of an oral statement made by such witness and
recorded contemporaneously with the making of such oral
statement." 18 U.S.C. § 3500(e)(1)-(2). As to written statements,
the evidence must show that the witness adopted the notes. United
States v. Marrero-Ortiz, 160 F.3d 768, 776 (1st Cir. 1998). This
extends to notes taken during law enforcement surveillance. See
United States v. Pastrana-Román, 2023 WL 11806215, at *4 (D.P.R.
2023) (López-Soler, M.J.) (citing cases), R&R adopted, 2024 WL
2269054 (D.P.R. 2024). In this case, Officer Hiraldo testified

that he "verified" and "corrected" the rough notes taken by other agents to produce his sworn statement—clearly, he did not adopt or approve their rough notes. *See* (Docket No. 55 at 61).

Defendant contends that the statements are substantially verbatim and therefore fall within the ambit of the Jencks Act. However, there was no evidence presented at the hearing that the officers taking rough notes were "recording the exact words of the witness." United States v. Newton, 891 F.2d 944, 954 (1st Cir. 1989). Although the officers were taking notes in a laptop, the fact that the document later required further editing by Officer Hiraldo suggests that the notes were not stenographic in nature. This reasoning is bolstered by the fact that "rough notes of an agent's surveillance activities are often sketchy and incomplete, made in a hurry, [and] at different times[.]" United States v. Bernard, 623 F.2d 551, 557-58 (9th Cir. 1979). Thus, the request to produce rough notes or, in the alternative, to strike Officer Hiraldo's testimony, is **DENIED**.

### B. Defendant failed to establish Fourth Amendment standing as to the purse

The Fourth Amendment establishes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Fourth Amendment rights are personal rights which . . . may not

be vicariously asserted." Alderman v. United States, 394 U.S. 165,
174 (1969). The person claiming the protection of the Fourth
Amendment must demonstrate a legitimate expectation of privacy in
the area searched or the item seized. Rakas v. Illinois, 439 U.S.
128, 143 (1978). The burden of establishing this expectation of
privacy is often referred to as Fourth Amendment standing, and it
is a burden that falls squarely on the defendant. Rawlings v.
Kentucky, 448 U.S. 98, 105 (1980). "[T]he defendant must show both
a subjective expectation of privacy and that society accepts that
expectation as objectively reasonable." United States v. Mancini,
8 F.3d 104, 107 (1st Cir. 1993). Until the defendant does so,
whether a violation of the Fourth Amendment occurred is not
legitimately in issue. United States v. Aguirre, 839 F.2d 854, 856
(1st Cir. 1988).

       In Aguirre, the First Circuit laid out the factors relevant
to the threshold question of standing: "ownership, possession,
and/or control; historical use of the property searched or the
thing seized; ability to regulate access; the totality of the
surrounding circumstances; the existence or nonexistence of a
subjective anticipation of privacy; and the objective
reasonableness of such an expectancy under the facts of a given
case." Id. at 856-57. However, "[n]o single factor determines
whether an individual" has an expectation of privacy protected by

the Fourth Amendment. <u>Oliver v. United States</u>, 466 U.S. 170, 177 (1984).

Defendant contends that he has standing to challenge (a) the search of the Nissan Sentra and (b) the search of the purse that was inside of it. (Docket No. 61 at 10). That he has a reasonable expectation of privacy in his vehicle is not in doubt. *See* <u>Byrd v. United States</u>, 584 U.S. 395, 404 (2018) ("One who owns and possesses a car . . . almost always has a reasonable expectation of privacy in it."). Mr. De Jesus argues, however, that the rule extends to all items and containers within the vehicle as well, which crucially includes the purse containing the firearm.

In <u>Rawlings v. Kentucky</u>, 448 U.S. 98 (1980), the Supreme Court held that a defendant did not have standing to challenge the search of his girlfriend's purse, which occurred during a lawful search of a home. <u>Id.</u> at 105-06. Moreover, the logic of <u>Rawlings</u> has been extended to the vehicle context by several circuit and district courts. *See, e.g.,* <u>United States v. Rusher</u>, 966 F.2d 868, 875 (4th Cir. 1992) (finding defendant had no standing to challenge search of passenger's purse); <u>United States v. Jackson</u>, 15 F.3d 1160 (unpublished) (D.C. Cir. 1994) (same); <u>United States v. Kelly</u>, 46 F. Supp. 2d 624, 627 (E.D. Tex. 1999) (same); <u>United States v. Glaspie</u>, 993 F. Supp. 448, 458 (W.D. La. 1998) (same); <u>United States v. Sandreth</u>, 2011 WL 4924262, at *7 (N.D.W. Va. 2011)

(holding passenger-defendant had no standing as to driver-wife's purse); *cf.* Mabra v. Gray, 518 F.2d 512, 513 (7th Cir. 1975), *cert. denied*, 423 U.S. 1023 (1975) (stating that as "a matter of federal law, appellant may not assert an alleged violation of his wife's Fourth Amendment rights as a basis" for suppression). *But see* United States v. Hurd, 2000 WL 34033043, at *3 (N.D. Iowa 2000) (Zoss, M.J.) (concluding that truck owner could challenge search of vehicle and articles found within it).

Defendant claims his case is distinguishable from Rawlings, but, if anything, the facts presented to the Court suggest that Mr. De Jesus has a lower expectation of privacy than the defendant in that case. For example, the purse in Rawlings was on a couch in between the defendant and his girlfriend, *see* 448 U.S. at 101, but the bag in the case at bar was squarely on the floor of the passenger side of the vehicle. Although Defendant did claim the firearm in the purse as his, he disclaimed ownership of the bag's other contents. Finally, he noted multiple times while calling his cousin that the bag belonged to his consensual partner. Mr. De Jesus did not put on additional evidence that, *inter alia*, he owned or controlled the purse; that he had access to it prior to the early morning hours of February 1, 2024; or that he could regulate access to it. As one Supreme Court justice has noted, "[p]urses are special containers. They are repositories of especially

personal items that people generally like to keep with them at all times." _Wyoming v. Houghton_, 526 U.S. 295, 308 (1998) (Breyer, J., concurring) (holding that probable cause to search a car extends to passengers' belongings in the car). Based on the evidence presented in this case, it is unlikely that a personal item like a purse would be shared in a such a way that Defendant could meet his burden to establish he had a subjectively reasonable expectation of privacy in the purse. Thus, he does not have Fourth Amendment standing to challenge the search of it. The _Motion_ is **DENIED** as to the firearm, magazines, ammunition, and brown purse.

## C. PRPB officers had probable cause to arrest Defendant

Defendant claims that the PRPB lacked reasonable suspicion to conduct a _Terry_ stop, and that his ensuing arrest and search of the vehicle was therefore impermissible. By contrast, the Government avers that not only did the officers have reasonable suspicion, they had probable cause. The Government is correct.

As previously noted, the Fourth Amendment guards against unreasonable searches and seizures. _See_ U.S. Const. amend. IV. Arrests are seizures of persons and must be reasonable under the circumstances. _See_ _Payton v. New York_, 445 U.S. 573, 585 (1980). A warrantless arrest is reasonable under the Fourth Amendment if an officer has probable cause to believe that a crime was committed in his presence. _Atwater v. Lago Vista_, 532 U.S. 318, 354 (2001).

"[P]robable cause exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been . . . committed and that the suspect is implicated in its commission." United States v. Flores, 888 F.3d 537, 543 (1st Cir. 2018) (quoting Morelli v. Webster, 552 F.3d 12, 21 (1st Cir. 2009)).

Probable cause is assessed based on the totality of the circumstances known to the officers at the time of the arrest. French v. Merrill, 15 F.4th 116, 125 (1st Cir. 2021) (citing Flores, 888 F.3d at 544). It can be determined based on the "collective knowledge and information of all the officers involved." United States v. Paradis, 802 F.2d 553, 557 (1st Cir. 1986) (citing United States v. Rose, 731 F.2d 1337, 1342-43 (8th Cir.), cert. denied, 469 U.S. 931 (1984)). Moreover, probable cause is a "fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 243-44. In other words, probable cause "is not a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014). The Government bears the burden of establishing probable cause. See United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997) (citations omitted). However, the probable cause established for

an arrest and a search incident to that arrest can be for an offense different than the crime that is ultimately charged and prosecuted. *See* id. at 218.

In the instant case, the PRPB officers collectively possessed sufficient information to give rise to probable cause at the time of Mr. De Jesus' arrest. Officer Hiraldo saw Defendant's car pull up toward the drug point and the driver exchange cash for small, clear baggies of what appeared to be cocaine. The officer had conducted surveillance of that same drug point approximately seventy times before. Moreover, Officer Hiraldo observed the transaction with full visibility on a sunny day while using binoculars. The observation of the hand-to-hand transaction, combined with the officer's awareness of the modus operandi of the drug point, is sufficient to establish probable cause. *See, e.g.*, United States v. Sands, 815 F.3d 1057, 1062 (7th Cir. 2015) (finding informant tip coupled with hand-to-hand transaction through driver's side window established probable cause for arrest); United States v. Johnson, 599 F.3d 339 (4th Cir. 2010) (noting hand-to-hand exchanges sufficed to establish reasonable suspicion at a minimum, which became probable cause upon sight of a heroin gelcap).

Defendant contends that it was impossible for Officer Hiraldo to view the transaction because it occurred inside the car rather

than outside of it. However, even if this were true, the combination of the officer's awareness of the modus operandi of the drug point and the inferable hand-to-hand transaction could establish probable cause. *See, e.g.,* Flores, 888 F.3d at 544 (finding apparent hand-to-hand drug buy conducted entirely within a vehicle could contribute to probable cause).

More critically, however, the Court does not credit Defendant's testimony after listening to direct and cross-examination and observing his demeanor. On the stand, Mr. De Jesus contradicted himself when testifying about how much money was in his girlfriend's purse. *Compare* (Docket No. 58 at 81) ("There was never any money inside the purse.") *with* id. at 90-91 (Defendant conceding that he told his cousin there was over $2,000 in the purse). Moreover, Mr. De Jesus acknowledged that he hoped the that his *Motion* would be granted and the case against him dismissed. (Docket No. 58 at 94-95). The Court also takes notice that defendant had the "ability to hear prior testimony and to tailor his account accordingly," which also factors into its analysis of his credibility. Portuondo v. Agard, 529 U.S. 61, 73 (2000). Nevertheless, this credibility assessment is limited to the context of the suppression hearing and to elucidate the record, and it has no bearing on future proceedings. *See* United States v. Mirkin, 649 F.2d 78, 82 (1st Cir. 1981).

Thus, the Court is also skeptical of Defendant's claim that the drug transaction occurred by the intersection of Blanca Street and Nueva Palma Street, outside of Officer Hiraldo's line of sight, rather than near the intersection of Roosevelt Street and Blanca Street. Mr. De Jesus cites to the transcription of the police radio call to support his claim that he was on Nueva Palma Street, but notably the statement from PRPB officers that "he's moving, he's moving. Through the Nueva Palma Street" occurred **after** Officer Hiraldo observed the drug transaction and explained "I will tell you shortly where they are **moving to.**" Exhibit 2A at 2 (emphasis added).

Defendant contends that there was no probable cause because the arresting officers did not have sufficient collective knowledge. *See* (Docket No. 61 at 15). The First Circuit has delineated two categories of cases applying the collective knowledge doctrine: vertical cases, where an officer with information amounting to probable cause directs another officer to make arrest, and horizontal cases, where information is pooled or aggregated across all officers involved in the investigation. United States v. Balser, 70 F.4th 613, 619 (1st Cir. 2023) (citations omitted). The categories are not mutually exclusive. Id. at 619-20 (citation omitted). Based on the testimony and evidence presented, this appears to be a case involving vertical

collective knowledge, a doctrine that "has sparked little controversy." *See* id. at 620 (citing Commonwealth v. Privette, 204 N.E.3d 967, 975-76 (2023)) (finding that case where directing officer had all information to establish probable cause was a vertical case).

Here, Officer Hiraldo observed the Defendant's drug transaction at a known drug point that he had previously surveilled many times before. Over the radio, Officer Hiraldo then informed his fellow officers that "**the driver** was the one who did the negotiations," and during his testimony, he explained that "negotiations" or "dealings" meant the purchase or buying of controlled substances. (Docket Nos. 49-1 at 2 and 55 at 94) (emphasis added). Officer Hiraldo also told the intervening officers the license plate, make, model, and color of Defendant's car. This information is sufficient to serve as a directive. *See* Balser, 70 F.4th at 621-22 (collecting cases and noting that probable cause can be imputed through the sharing of "basic information"). Accordingly, the information regarding probable cause possessed by Officer Hiraldo was properly imputed to Officer Santiago and the other members of the intervention team pursuant to the collective knowledge doctrine.

Because the Court finds that the PRPB had probable cause to arrest Mr. De Jesus, it is not necessary to also discuss the

question of whether the officers had reasonable suspicion, a lower standard. *See* United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001) ("Reasonable suspicion . . . is an intermediate standard.")

### D. The search of the Nissan Sentra was lawful

Because the PRPB lawfully arrested Mr. De Jesus, any ensuing search of the vehicle would also have been permissible. The police may search a defendant's person and the passenger compartment of his vehicle pursuant to a lawful arrest. United States v. Fiasconaro, 315 F.3d 28, 37 (1st Cir. 2002) (citing New York v. Belton, 453 U.S. 454, 460 (1981)). This holding extends to containers within the passenger compartment, such as "closed or open glove compartments, consoles, or other receptacles" excluding the trunk. Belton, 453 U.S. at 460, 460 n.4. A search incident to arrest is limited to circumstances where the "arrestee is within reaching distance of the passenger compartment at the time of the search **or it is reasonable to believe that the vehicle contains evidence of the offense of arrest**." Arizona v. Gant, 556 U.S. 332, 351 (2009) (emphasis added).

The latter situation applies here. Defendant claims that he did not hand Officer Santiago the two clear baggies of drugs, but rather hid them in "a small drawer that is in the vehicle's ceiling." (Docket No. 58 at 69-70). Assuming, *arguendo*, that this version of events is true, the officers could reasonably believe

that the two baggies of drugs that Mr. De Jesus had purchased minutes before were still in the Nissan Sentra. And, per <u>Belton</u> and its progeny, PRPB officers could search areas like a rooftop sunglasses compartment for those drugs. Thus, the search for and seizure of the packets of drugs was appropriate, even under Defendant's version of the facts.

Having already addressed Defendant's lack of standing, the Court declines to further address the search and seizure of the purse containing the weapons.

**E. Defendant's statements upon arrest were voluntary**

In Defendant's *Motion*, he claimed that federal agents violated his Fifth Amendment rights. As already discussed, the Government stated that it would not use statements made to HSI agents in its case in chief, and the *Motion* was granted as to those statements. Mr. De Jesus did not brief the issue of whether PRPB officers violated his Fifth Amendment rights in either the original *Motion* or the post-hearing filings; however, the Government contends that those statements were spontaneous and voluntary, and therefore admissible. Because Defendant did not brief this issue, the Court considers it waived.

Nevertheless, and out of an abundance of caution, the Court briefly discusses the statements Defendant made to PRPB officers upon his arrest. The Fifth Amendment provides that "[n]o person

. . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Involuntary confessions are inadmissible pursuant to this amendment. <u>Dickerson v. United States</u>, 530 U.S. 428, 433 (2000). Courts determining whether a defendant's statement was voluntary consider the totality of the circumstances, which includes the nature of the police activity and the defendant's personal circumstances. <u>United States v. Jacques</u>, 744 F.3d 804, 809 (1st Cir. 2014) (citations omitted). The provision of <u>Miranda</u>[4] warnings is an "important factor," although not the only one. <u>Brown v. Illinois</u>, 422 U.S. 590, 603 (1975). The government must prove voluntariness by a preponderance of the evidence. <u>United States v. Jackson</u>, 918 F.2d 236, 241 (1st Cir. 1990) (citing <u>Lego v. Twomey</u>, 404 U.S. 477 (1972)) (involving defendant who immediately confessed to possessing cocaine upon arrest).

Here, the testimony and video evidence reflect that Defendant's car was approached by six uniformed and plainclothes PRPB officers. Officer Santiago placed Mr. De Jesus under arrest and quickly provided <u>Miranda</u> warnings. The officer did not ask any questions. Generally, these factors weigh in favor of a finding of voluntariness. The Court credits Officer Santiago's testimony

---

[4] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

regarding this interaction, as it is at least partially corroborated by Officer Farias' testimony. *See* United States v. Candelario-Santana, 834 F.3d 8, 20 (1st Cir. 2016) (admitting post-Miranda, spontaneous statements where district court found law enforcement witness credible).

Moreover, the Court also considers the Defendant's personal characteristics, which include the fact that he has prior experience with the criminal justice system. *See* (Docket No. 8 at 3); Jacques, 744 F.3d at 809 (finding confession was knowing and voluntary where defendant was implicated in multiple past criminal matters). Mr. De Jesus alleges no infirmities due to age, education, intelligence, or mental condition. *See* Jacques, 744 F.3d at 809 (identifying the listed characteristics as part of defendant's personal circumstances and the voluntariness inquiry).

Defendant testified that he was coached by Officer Santiago about what to say to protect his consensual partner from facing charges. (Docket No. 58 at 71). But the First Circuit has held that even if it assumed the police used "an implied 'threat' or 'promise' that [defendant's relative] might be caused or spared harm, depending on whether or not [defendant] admitted ownership of the firearm, [the panel] still could not conclude that his will was overborne." Jackson, 918 F.2d at 242; *see also* United States v. De La Cruz-Arias, 444 F. Supp. 3d 315, 317 (D.P.R. 2020)

Criminal No. 24-046 (RAM)                                              28

("Assuming responsibility for contraband initially attributed to a relative does not undermine a voluntary confession.").

Thus, the Court finds that Defendant's spontaneous statements to PRPB officers were voluntary and therefore should not be suppressed.

### IV.  CONCLUSION

For the foregoing reasons, the Court **ORDERS** that Defendant Pedro Luis De Jesus-Ortiz's *Motion to Suppress Evidence* at Docket No. 20 is **GRANTED IN PART** as to the statements made to HSI agents and **DENIED IN PART** as to all remaining issues.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of September 2024.

s/Raúl M. Arias-Marxuach
UNITED STATES DISTRICT JUDGE